### VEZINA v. UNITED STATES et al.

### VALLIER v. SAME.

(Circuit Court of Appeals, Eighth Circuit. October 19, 1922.)

Nos. 5836, 5837.

Estoppel ⬅62(2)—Settlement on unallotted land held not to give rights by estoppel.

Settlement on and improvement of land on an Indian reservation by persons of the tribal blood *held* not to create an estoppel which could affect the right of the United States to allot the land to others, where such settlers knew that their enrollment was essential to allotments, and their applications to the tribal council for enrollment had repeatedly been refused, and in consequence their application for allotments by the department rejected.

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Actions in ejectment by the Luck Land Company against Henry Vezina and the United States, and by Henry Harty against Josephine Vezina Vallier and the United States. From decrees denying defendants equitable relief on cross-complaints, they appeal. Affirmed.

F. H. Peterson, of Moorhead, Minn., for appellants.

Marshall A. Spooner, of Bemidji, Minn. (Alfred Jaques, U. S. Atty., of Duluth, Minn., on the brief), for appellees.

Before SANBORN and STONE, Circuit Judges, and TRIEBER, District Judge.

STONE, Circuit Judge. No. 5836 is an ejectment suit by the Luck Land Company against Henry Vezina. No. 5837 is a similar suit by Henry Harty against Josephine Vezina Vallier, a sister of Henry Vezina. The cases were consolidated for trial. The lands in question are in the White Earth Reservation of the Chippewa Indians, located in Minnesota. Plaintiffs are grantees from the allottees of these lands. The United States was made party defendant. Defendants, Vezina and Vallier, defended on the ground that the title and possession was in them and prayed that title be quieted in them. The United States

answered denying the rights of the individual defendants and praying denial of the affirmative relief sought by them. From decrees for the plaintiffs, the individual defendants bring these appeals.

The lands were never allotted to Vezina and Vallier, nor were they, at the time these appeals were taken, upon the tribal enrollment, which was the basis of right to allotment. Counsel agree that in 1920, pending hearing of this appeal, they were enrolled. The Vallier land was duly allotted, in 1908, to the grantor of Harty; and the Vezina land, in 1911 to the grantor of the Luck Land Company. Appellants state the issues here as follows:

"The appeal and assignments of error in this case raise two questions: One, that under all of the facts, as they are detailed by the witnesses and appear by the exhibits, defendants have shown themselves to be persons of Indian blood and descent so as to entitle them to an allotment under the various acts of Congress; and, second, the defendants having taken possession of their respective tracts of land under the sanction of the government and having remained in possession all these years and having made improvements on the land, the government is now estopped from claiming that they were not entitled to allotments."

As to the first issue, it is enough to say that it is conceded that the right to allotment was not established in the record of this case. However, as it was established pending this appeal; as that fact is conceded by counsel and as counsel for both parties have asked that it be considered in these cases, we will accept that fact as established for the purposes of these cases. That alone does not entitle appellants to prevail over others to whom the land was actually allotted and who were, at the time of allotment, concededly entitled to allotments. There is a material difference between being entitled to an allotment and being entitled to these particular lands as allotments over others, also entitled to allotments, to whom these lands were actually allotted.

Conceding rights to have allotments to exist in appellants, they must depend upon the second issue to sustain their rights to these lands. We pass over the situation that the estoppel is urged against the United States alone and not against the plaintiffs, who are seeking the land, and treat the matter as though the estoppel applied to all.

The statements of facts, as set forth in appellants' brief may be summarized as follows: Henry Vezina, 59 years old, was born at Mendota, Minn. His parents moved to Minneapolis when he was 2 years old and he there attended school and later worked in the flour mills. His mother and father went to White Earth in 1889 and he and other members of the family went several months later. He went in response to the wide call sent out through newspapers, advertisements and otherwise by the United States Commissioners, to persons of Chippewa blood inviting them to come to White Earth and take their allotments. He met with no encouragement in 1889 and returned to Minneapolis and to his work as a flour packer. He visited White Earth again in 1891 and in 1895 and finally returned there to stay in 1902. His mother had remained on the reservation since 1889, but had trouble in obtaining her allotment. She and Henry, in 1895, went to Maj. Baldwin, who was then United States Indian Commissioner,

at the Indian office at White Earth and asked him about their rights and they were told by him to go onto their lands and improve them and they would never be molested. In 1902 Henry returned to the reservation, found vacant land, went to Simon Michlet, the Indian agent at White Earth and told him that he had selected an allotment and asked him if he had any rights on the reservation and Michlet then said to him that he had more rights on the reservation than many people who were on the roll, but that he was sleeping on his rights. He then told Michlet that he was going onto his allotment and improve it. He selected 80 acres of vacant land in section 12, township 146, range 40, and then went to Duane F. Porter, an Indian missionary who was a subordinate in the government employ. He told Porter he had selected an 80 as an allotment and asked him to survey it for him. Porter told him that he was going to the Indian office at White Earth in a little while and would ascertain if the land was vacant and let him know. Porter found that the land Henry Vezina had selected was vacant and that there was much other vacant land in that vicinity. He went to the northern part of the reservation where Henry was staying and surveyed out the 80 and gave Henry the "minutes" of his land, a sheet of paper having on it the name of Henry Vezina and the description of the selected land. Porter then filed a duplicate of this paper at the Indian office at White Earth, but Michlet refused to allot because Henry was not on the roll. Exactly the same formality was used in this attempted allotment to Henry Vezina as Porter used in making allotments to other Indians and mixed bloods.

Henry Vezina then went on this land in 1902, built him a house, barn and granary, grubbed up about 38 acres of wood land, built fences, dug ditches, sunk wells and has resided there continuously ever since. His improvements on the land are worth $3,500.

In 1903 Henry Vezina selected another vacant 80. He consulted Porter, as before, who surveyed the land, gave the minutes of it to Henry Vezina and filed a duplicate at the office of the Indian agency with the clerk in charge of that work, but the allotment was refused as before on the ground that Henry was not on the roll. In 1904 he made an affidavit showing the selection of his land, the description and improvements, and sent it together with similar affidavits made by his mother and other members of the family who have selected allotments, to the United States Indian Department at Washington. The department acknowledged receipt of the affidavits on a card sent to Henry and others, but wrote to the agent at White Earth in May, 1904, informing the agent of the receipt of the affidavits and directing him to tell Vezina that he had no rights on the land. Henry Vezina did not received that notice, but he was notified twice to vacate; the first time in 1907 by the United States District Attorney of Minnesota, and again in 1912 by Mr. Hinton, but this was after he had made his improvements and established his residence on the land. Long before this Henry Vezina and other members of the family had applied for an enrollment as members of the tribe to various Indian councils. The fights for enrollment were usually made in the mother's name and they are referred to in the records as Elizabeth Vezina and family.

They were uniformly rejected by the Indian councils, generally without any hearing at all, and on the ground of res judicata. About the year 1889 or 1890 Elizabeth Vezina's claim was considered by an Indian council which rejected the claim. All succeeding councils and officers, who have assumed to report against her and the family, have harked back to that decision.

Commissioner Baldwin reported to the Indian Department in their favor. Commissioner Hall made a report opposing her, but afterwards and just before retiring from office he reversed his former decision and reported in her favor. Maj. Michlet investigated their claims and reported in their favor several times. The authorities at Washington in enrollment matters have acted generally upon the recommendations of the Indian councils, but at least twice the Indian office at Washington investigated the Vezina claims and expressed themselves in favor of the enrollment of Mrs. Vezina and her children, and instructed the agent to bring the matter to the attention of the next Indian council and help the Vezinas in the presentations of their claims for enrollment.

The Vezinas were notified to appear and did appear but were refused a hearing. They appeared at White Earth many times for council meetings, but sometimes no council was held and at other times their matter was not considered. Henry and his people attended every council meeting where they were notified to be present.

The Vezinas all lived there together alone in one neighborhood in a corner of the reservation. They talked their troubles over together and together they went to the councils. They united in appealing to the department and at one time to the President; they knew and talked about these various letters from the department. They knew the attitude of the commissioners in 1907 and 1908, the position which Commissioner Baldwin had taken, the attitude of Superintendent Michlet and of Commissioner Hall, who finally changed his opposition and recommended them for enrollment. What one knew of their land matters all knew and all were influenced by the same circumstances and acted from the same motives.

The foregoing statement of facts applies equally well to the Vallier case, except that Mrs. Vallier did not live on her land. She broke up and cultivated 30 acres of it and ditched the same and has cropped it from year to year, but she lives on adjacent land in a house which she and her husband had built on their son's land. Her improvements aggregate about $2,500.

In 1918, Henry Vezina's land being in the track of one of the disastrous forest fires which swept over the northern country at that time, all of his buildings were burned. He bought lumber and rebuilt a house and barn on the site of his other buildings and spent about $2,500 for these second improvements. When asked upon cross-examination why he builded a second time there in the face of the ejectment suit pending against him, he answered because Baldwin had told him to go there and he believed he would get his land.

Although we are not unmindful of the rule which requires that decrees supported by substantial evidence are not to be disturbed upon

appeal; and although there was much substantial testimony to sustain the decree; we have set forth the view of the evidence most favorable to appellants, as viewed by their able counsel. From this summary, it is clear that these appellants knew prior to settling on the land and at all times covered by this record, that enrollment was a prerequisite to allotment and that they were not enrolled. More than this, their repeated attempts to secure enrollment were always unsuccessful. They show, also, that, in 1907 and 1908, various government officials desired to and tried to aid them in securing enrollment. With this knowledge of the situation, how can it be said that the government has led them into a position where it would now be inequitable for it to base a defense upon these very facts well known to them? Without discussing the question of when estoppel can be urged against the sovereign government, it is sufficient, that in this case there would be no basis for an estoppel against a private litigant.

The decrees are affirmed.